## · J. S. Young *v.* J. H. P. Weakley *et al.*

### (*Nashville.* December Term, 1920.)

1. **VENDOR AND PURCHASER.** Purchaser required to prove sale by acre instead of in gross by clear evidence in view of recitals in purchaser-money note and deed.

Where the purchaser-money note and the deed described . land as being seven hundred fifty acres, more or less, the purchaser, to defeat recovery by vendor of full amount of stipulated purchase price because of deficiency in acreage, was required to prove that the sale was the sale by the acre at a given price per acre instead of in gross by clear and unmistakable evidence. (*Post, pp.* 368-379.)

Case cited and distinguished: Caughron v. Stinespring, 132 Tenn., 636.

2. **VENDOR AND PURCHASER.** Evidence held insufficient to prove sale one by acre instead of in gross.

Evidence *held* insufficient to prove that conveyance of land described in deed as seven hundred and fifty acres, more or less, was a sale by the acre for specified amount per acre, instead of in gross. (*Post, p.* 379.)

3. **VENDOR AND PURCHASER.** Purchaser's cross-bill complaining of deficiency in acreage held to plead willful misrepresentation, and not mutual mistake.

In vendor's action for balance of purchase price, purchaser's cross-bill complaining of deficiency in acreage *held* to plead willful misrepresentation by vendor as to amount of land, and not mutual mistake. (*Post, pp.* 379-383.)

Case cited and approved: Caughron v. Stinespring, 132 Tenn., 636.
Case cited and distinguished: Bigham v. Madison, 103 Tenn., 358.

4. **VENDOR AND PURCHASER.** Deficiency in acreage no ground for relief where sale was in gross.

Young v. Weakley.

Where purchaser rode over the farm before the purchaser thereof, and there was no mutual mistake as to the boundaries of the farm and no examination by purchaser of land which he did not subsequently receive, a mere mistake as to the quantity of land embraced within the boundaries, in that it contained only six hundred eighty-five acres, though described in deed as seven hundred fifty acres, more or less, was not ground for relief, where the sale was in gross instead of a sale by acre, in the absence of fraud or misrepresentation. (*Post, pp.* 383, 384.)

Case cited and distinguished: Shields v. Thompson, 63 Tenn., 227.

5. **VENDOR AND PURCHASER.** Discrepancy of 66 acres in supposed tract of seven hundred fifty acres held not so great as to shock conscience.

Discrepancy of sixty-six acres in supposed tract of seven hundred fifty acres *held* not so great as to shock the conscience and entitle the purchaser to recover on the ground of fraud. (*Post, pp.* 384-394.)

Cases cited and approved: Adams v. Brown, 63 Tenn., 124; Allison v. Allison, 9 Tenn., 16; Witherspoon v. Porter, 1 Shan. Cas., 666; Myers v. Lindsay, 73 Tenn., 331; Hillis v. Martin, 2 Shan Cas., 273; Deakins v. Alley, 77 Tenn., 494; State, to the use, etc., v. Keller, 79 Tenn., 399; Caughron v. Stinespring, 132 Tenn., 636, Hendrick's Heirs v. Mosley, 11 Tenn., 74; Waters v. Hutton, 85 Tenn., 109.

Cases cited and distinguished: Rich v. Scales, 116 Tenn., 57; Hendrick's Heirs v. Mosley, 11 Tenn., 74; Neal v. Allison, 1 Shan. Cas., 146; Horn v. Denton, 34 Tenn., 125; Miller v. Bentley, 37 Tenn., 671; Barnes v. Gregory, 38 Tenn., 230; Bradley v. Dibbrell, 50 Tenn., 522; Moses v. Wallace, 75 Tenn., 413; Waters v. Hutton, 85 Tenn., 109.

FROM RUTHERFORD.

Appeal from the Chancery Court of Rutherford County. —Hon. WALTER S. BEARDEN, Chancellor.

JAMES B. NEWMAN and A. W. AKERS, for appellant.

T. B. LYTLE and E. D. HANCOCK, for appellees.

MR. SPECIAL JUSTICE MALONE delivered the opinion of the Court.

This case involves an alleged deficiency in the acreage in a valuable tract of land in Rutherford county, sold by the appellee Weakley to the appellant, Young.

The deed given by Weakley to Young described the land as containing seven hundred fifty acres, more or less. It is admitted that when the land was finally surveyed it did not contain seven hundred fifty acres, but lacked sixty-five and nine tenths acres containing that amount.

All of the purchase money was paid, except a balance of $2,000 on the last lien note, and the original bill in this case was filed by Weakley against Young to collect said balance.

Young filed an answer in which he denied liability, claiming that the sale had been made by the acre at the price of $42.66 per acre, and that, in view of the deficiency of sixty-five and nine tenths acres above mentioned, Weakley was, in fact, indebted to him. He also claimed that Weakley owed him a balance of $350 on an account between them.

On the same day he filed a cross-bill against the complainant Weakley and also against Mrs. Lytle, Weakley's daughter, together with her husband, E. F. Lytle. The

reason for joining these additional defendants was that Weakley had only a life estate in the farm, and his daughter, Mrs. Lytle, had a remainder interest.

In this cross-bill it was contended at length on behalf of Mr. Young that the farm was represented to him as containing seven hundred fifty acres, and that he had bought said farm by the acre at the agreed price of $42.66 per acre; that this sum was agreed upon after negotiations with the complainant, Weakley, who had asked $46 an acre, while Young had at first offered $40.

He claims in said cross-bill that his original trade with Mr. Weakley was made in October, 1907; that Weakley then represented that he had a good title to said farm, and that it contained seven hundred fifty acres; that a deed was not executed by Weakley to him until December 28, 1909; that between the date of the original contract and the date of executing the deed a survey had been made which showed a deficiency of some fifty-seven acres, and that this was brought to Weakley's attention; that Weakley contended the surveyor had made a mistake, and assured Young that he had sold him seven hundred fifty acres, that the place contained seven hundred fifty acres, and that he (Weakley) would make good any deficiency; that after receiving his deed, and after paying all of the purchase money but $2,000, a second survey of the place was made, and this survey showed the deficiency to be as now claimed, to wit, sixty-five and nine tenths.

The cross-complainant charges that Mr. Weakley knew he did not have seven hundred fifty acres when he sold the farm, despite his assurance to that effect, and that

this shortage was unknown to the cross-complainant, who believed he was getting the quantity of land which he was supposed to buy when said deed was executed to him.

He therefore claimed that, inasmuch as the sale was by the acre at $42.66 per acre, the deficiency more than covered the balance of the $2,000 due no his lien note.

He further claimed that Weakley owed him $350 on an account between them concerning certain live stock, filing an itemized statement of this account.

In said cross-bill Young states further that this price of $42.66 per acre included a considerable amount of live stock and crops that were on the place.

He prayed for an abatement of the purchase price to the extent of $2,815.56; that the vendor's lien note be delivered up and canceled; that he be given judgment against Weakley and his daughter for the difference between the amount of said abatement and the balance due on the purchase-money note; that, if necessary, the deed be reformed to show that the land sold to him contained six hundred eighty-four and one tenth acres instead of seven hundred fifty acres, etc.; and that he be giving judgment for $350, with interest on the itemized account concerning live stock, etc.

This cross-bill was sworn to by Mr. Young.

The cross-defendants, Weakley and his daughter, Mrs. Lytle, and her husband, answered said cross-bill, denying in detail most of its allegations.

They say it is absolutely untrue that said farm was sold at $42.66 an acre, and claim that, if this had

been so, the exact price, on a consideration of $32,000, would be $44.66⅔ per acre.

They claim, however, that the sale was made in gross not only for the farm, but for a large amount of valuable live stock; the live stock itself being worth approximately $12,000 to $15,000. They claim that Weakley went with Young to the farm and carried him all around the lines, showing him every line fence, and that Young was satisfied and perfectly willing to take the farm as a whole with the live stock and crops for the sum of $32,000.

They claim that Young's contention that the farm was sold by the acre is a mere subterfuge and afterthought to escape the payment of a just debt.

The cross-defendant Weakley denies that he represented that said farm contained exactly seven hundred fifty acres, and denies that he said anything which would lead Young to believe or rely upon any such warranty or stipulation.

He further calls attention to the fact that Young procured a deed to said land in 1909, after waiting more than two years from the date of his original contract under the title bond.

He relies on laches, and also pleads the statute of limitation of six years.

Under the pleadings thus outlined, a number of depositions were taken, and the case was heard by the chancellor. He rendered a decree adjudging that the allegations of the original bill were sustained by the proof, and that the complainant, Weakley, was entitled to a recovery in the sum of $3,256.15, and a lien was retained on the tract of land to secure payment of this amount.

He further held that the allegations of the cross-bill were fully met and denied by the answer, and not sustained by the proof, except that under his claim upon the open account for live stock, etc., cross-complainant, Young, was entitled to a recovery of $300, with interest, amounting to $327.30, which amount it was adjudged the cross-complainant, Young, was entitled to recover against the complainant, Weakley.

It was therefore adjudged that the complainant, Weakley, recover of the defendant, Young, the net amount of $2,028.85, for which a lien was declared on the land, and a sale was ordered to satisfy the same, but by agreement of counsel a sale at present is not asked.

From so much of said decree as denied cross-complainant Young, any relief under his cross-bill for the value of shortage in land, he appealed to this court, and has assigned errors.

In this court the appellant makes three contentions:

(1) That under the proof adduced the sale in question was by the acre at a given price per acre.

(2) That the vendor represented to appellant that the tract of land did contain 750 acres; that the vendee considered that he was purchasing and the vendor was selling this quantity; that this representation was relied on by the vendee, was a material inducement to the purchase, and the real basis for the aggregate sum to be paid; It is therefore contended that under these facts relief can be had by the purchaser even though the sale be one in gross.

(3) Because the deficiency (amounting to substantially sixty-six acres) in a tract supposed to contain seven

hundred fifty acres is so great as to shock the conscience of the court, and that under the facts of this case appellant is entitled to recover for such deficiency upon that theory.

We will deal with each of these contentions separately.

1. The first contention presents purely a question of fact. But in considering this question it is well to bear in mind the quantum of proof which is necessary.

The following rule was recently laid down by this court in the case of *Caughron* v. *Stinespring*, 132 Tenn., 636, 644, 179 S. W., 152, 154 (L. R. A. 1916C, 403):

"Where a matter of this kind must be presented by parol testimony alone, a safe rule to lay down would be that the proof should be clear and unmistakable, because matters arising outside the written instrument should be clearly proven."

In the present case the title bond (an informal instrument drawn by the complainant, Weakley, in his own handwriting) does not describe the acreage of the farm, its language being:

"  .  .  . My farm lying in the Sixth civil district of Rutherford county, Tennessee."

However, in the purchase note which is now sued on, the original whereof is also exhibited with the transcript, it is recited that—

"  .  .  . Lien retained on the farm until these notes are paid.

"At which time I bind myself, my heirs or assigns, to make a deed to said place of seven hundred fifty acres, more or less.  .  .  .

This title bond and note bear date October 15, 1907.

It is also to be noted that, when the deed was executed by Weakley as life tenant, and his daughter, Mrs. Lytle, and husband, more than two years later, to wit, December 28, 1909, it described the land by metes and bounds as follows:

"We John P. H. Weakley, Ephriam Lytle, and wife, Susie H. Lytle, have bargained and sold, and do hereby transfer and convey, unto the said J. S. Young, a certain tract or parcel of land situated in the Sixth civil district of Rutherford county, Tennessee, and more particularly described as follows:

"Known as the Hick Weakley land and beginning in the middle of the public road, . . . to the beginning, seven hundred fifty acres more or less, and being the same tract or parcel of land conveyed to John P. H. Weakley, deeds of Chas. L. Davis of record in Book 10, page 440, A. B. Jones and wife of record in Book 18, page 314, O. G. Tucker, of record in Book 20, page 498, S. P. Adkerson and J. M. Adkerson, of record in Book 24, page 252, M. M. Sanders and wife, of record in Book 29, page 203, and J. P. Wyatt and wife, of record in Book 5, page 471, in the register's office of Rutherford county, Tennessee, to all of which deed (s) reference is here expressly made."

In view of the original note showing that the sale was for seven hundred fifty acres, more or less, and in view of the deed accepted by Young more than two years afterward with this same language, it is evident that the case falls within the rule above set forth, and it should be clearly demonstrated that the sale was, in

fact, for exactly seven hundred fifty acres at an agreed price per acre.

There is some conflict in the evidence upon this point. The appellant, Young, swears squarely that he bought seven hundred fifty acres; that Mr. Weakley represented the place contained seven hundred fifty acres; that the purchase price of $32,000 was calculated on the exact basis of $42.66⅔ per acre; that he did not know and had no way of knowing the exact amount of land he was getting from Mr. Weakley except through Mr. Weakley's representation; and that he would not have purchased the farm on any other basis than a sale by the acre.

In support of his contention he shows he bought the farm on one day's notice, being taken over the place by Sam Weakley, a son of H. P. Weakley, and who died before the institution of the suit herein. He states he could not tell from this hasty examination of the place made on that occasion what its acreage was, and had to rely upon the representations of his vendor, Weakley.

He says that Mr. Weakley, his vendor, on the day after the purchase, agreed to have a survey of the place made as quickly as possible, but that no survey was in fact made until somewhere in February or April, 1909, when Weakley employed one McKnight and had the land surveyed; that this survey by McKnight showed a shortage of approximately fifty-seven acres, and Young at once took the matter up with Weakley, whereupon Weakley insisted that the survey was incorrect, saying that seven hundred fifty acres were there, and, if they were not, he would make it there.

144 Tenn.—24

Young further testified that Weakley said he was a surveyor and knew the tract contained seven hundred fifty acres, that it had not been accurately surveyed by McKnight, and that he would have it resurveyed. He says Mr. Weakley did take the matter up with a Mr. Henderson, a county surveyor, but did not employ him.

Young further testifies:

That he was a resident of Kentucky at the time of the purchase, and about October 15, 1907, the date of the purchase, went to Murfreesboro (near which the land in question lies) on a visit to his daughter, who was attending school at that place.

That he had never seen the land in question, and knew nothing about the farm until the day of the purchase.

That, having remarked on October 15, 1907, to some one whom he met at Murfreesboro, that he would like to buy a farm if he could get one to suit him, he was approached on the same day by Mr. Weakley, who said he had a farm for sale containing seven hundred fifty acres, and would like for him to look at it.

That upon the same day he went with the son of complainant, Sam Weakley, now deceased, to look at the farm, and rode over it, but could tell nothing about the acreage in so large a tract; that he remarked to young Sam Weakley that he would give $40 an acre for the farm, which would amount to $30,000, but Mr. Sam Weakley said he had no authority to price the farm.

That thereafter on the same day he had a conversation with the elder Weakley, complainant herein, and began negotations for the purchase of the farm.

That Mr. Weakley said he would not take $40 an acre, or $30,000, for it, but would take $35,000, and that upon figuring it out they found this amounted to a little over $46 an acre; that he (Young) refused to give this, but finally offered $32,000, which figured $42.66⅔ an acre, and that Mr. Weakley finally took him up on this offer, the trade being consummated upon an acreage basis.

He further said that he called for a survey and an abstract, and Weakley said he would furnish them later.

He is asked on his cross-examination why he executed a note describing the farm as containing seven hundred and fifty acres, more or less, but gives no very satisfactory explanation, simply saying that he told Mr. Weakley at the time:

"I will rely on what you say about it being seven hundred and fifty acres; that is all I know about it."

On his cross-examination he further testifies that he arrived at the price by dividing $32,000 by the number of acres.

He is then asked whether he took into account at all the live stock that was going in with the land, and answers:

"I figured that so far as I was concerned I was willing to give that for that land and put that stock in; that is the way I figured it, that I would give that for that land with that stock throwed in."

He further states that he figured the land at $42.66 and figured the stock to be worth about $6,000, although Mr. Weakley claimed they were worth $8,000.

It may be noted in passing that Mr. Young says on his direct examination that he got something like $8,000 or $9,000 out of the stock.

Young further shows on cross-examination that he accepted the deed from Weakley as it was written, and took it and had it recorded. He says:

"Q. And that deed itself reads that it is seven hundred and fifty acres, more or less?

"A. Yes, sir; I called Mr. Weakley's attention to it at the time, and he said it might vary a little at that time."

It may here be noted that the record discloses a very singular state of affairs with regard to this deed, for each of the parties seems to claim, upon oath, that he prepared it, or had it prepared, although it would apparently be to the advantage of either party to show that the opposite party in fact prepared the instrument describing the property as containing seven hundred and fifty acres, more or less.

It is true that Mr. Young in his testimony says that he thinks Mr. Weakley prepared this deed and tendered it to him. But in his cross-bill, to which he swore, he makes the following allegation:

"Cross-complainant further states, charges, and alleges that, after he had paid the two $10,000 notes above described, he secured counsel to make investigation of the title to the property which said Weakley by said bond of title or written instrument had sold the cross-complainant. Said counsel reported to cross-complainant that the greater portion of said property, to wit, approximately six hundred seventy-one acres, had been devised to said Weakley's wife by the will of her father, Wm. J. Muse, and by the will of her brother, Richard I. Muse, and that the said Weakley owned only a life estate

therein, his wife having died, with remainder to their living children, viz. Mrs. Susie Lytle, wife of E. F. Lytle, and Sam Weakley.

"This was some time in December, 1909. Thereupon cross-complainant immediately brought to the attention of cross-defendant this state of the title, insisting that a deed be made to him at once, to be executed not only by cross-defendant, but also by said Lytle and wife, and Sam Weakley and wife. This cross-defendant agreed to, but did not do, though often importuned by cross-complainant, until finally cross-complainant himself had a deed prepared and presented to cross-defendant Hickman Weakley before the death of Sam Weakley, and after considerable delay this deed was executed by cross-defendants, Hickman Weakley, Susie H. Lytle, and husband, E. F. Lytle.

"The original deed executed by these parties has been unintentionally lost or misplaced and cannot be found after diligent search. A certified copy of said deed is made a part of this bill marked Exhibit A, but need not be copied."

Complainant Weakley, with equal positiveness, swears that he prepared the deed himself in his own handwriting, and says he thinks old Mr. Huggins was sitting there with him when he prepared the deed, and that he had gone down to the county court clerk's room and found out the different memorandums concerning the various deeds to other persons, and from what he got there, and from what he knew, wrote the deed himself.

It is shown, however, that Mr. Weakley is a man of advanced age, being eighty-two years old at the time of

giving his deposition, and his memory is obviously much impaired. Some of his answers are absolutely contradictory to testimony given only a few lines above, and he states that Mr. Young made no complaint until fifteen or twenty years after the trade between them.

Returning, however, to the evidence introduced by the cross-complainant, Young to sustain his theory that the sale was made by the acre, and not in gross, the next witness introduced by him is his son, T. T. Young. This testimony, however, is of very little value, for Mr. Young was not present at the time of the trade, and was living in Kentucky until his father sent him down to take charge of the farm and make a $9,000 payment to Mr. Weakley. He tells of a visit made to the farm with Mr. Weakley and says:

"As we were on our way there we were talking about it, and I asked him how many acres he was selling, and he said seven hundred and fifty, and then, talking on, he also told me that he was to have the land surveyed and get an abstract for it."

The only other witness introduced on behalf of the cross-complainant Young was a Mr. Freeman, who testifies that he happened to be in the clerk and master's office and overheard a conversation between Mr. Young and Mr. Weakley. This conversation took place, to the best of the witness' recollection, a little more than a year before his deposition was given, and he relates it as follows:

"Mr. Young, I think, was the first one that mentioned about the number of acres, or something of the kind, and told Mr. Weakley that he had had it surveyed, and

that it didn't survey out seven hundred and fifty acres, and Mr. Weakley said that them surveyors made a mistake, he guessed, and Mr. Young said, 'I have had two to survey it and they both make it a whole lot less than seven hundred and fifty acres.' Then Mr. Weakley said, 'I sold you seven hundred and fifty acres, and I know it is there;' and he said, ''Them dog-goned fools just made a mistake in surveying it,' was just about the words he used about it.''

The witness says he has known Mr. Weakley all his life, practically, but had only known Mr. Young for a year or two.

Examining now the proof of the complainant and cross-defendant Weakley, Mr. Weakley himself testifies positively that he did not sell this farm to Mr. Young by the acre, but that it was sold as a whole, including live stock, etc. He denies positively that the farm was priced by the acre. We think, however, that his testimony is of little value because of the obvious failure of his memory which is exhibited throughout the deposition.

On behalf of Mr. Weakley, however, the deposition of J. M. Nelson is taken, and he details a conversation which he overheard between Mr. Young and Mr. Weakley at the clerk and master's office. It seems that the witness at that time occupied the position of deputy clerk and master under Mr. Weakley.

He says, in substance, that in the latter part of last year (1914) or the first part of this year (1915) Mr. Young came into the office and told Mr. Weakley that he had had the place surveyed and it was some acres short:

"He told Mr. Weakley it was short so many acres, and they then began discussing it, and Mr. Weakley asked him how he bought the place, and Mr. Young said that he bought it, that he paid so much money for the place and for the stock there was on it, and, if I am not mistaken, for some farming implements, and they talked about it for some time, and Mr. Weakley told him, he said, 'The deed calls for so many acres, more or less, doesn't it?' and Mr. Young said 'Yes.' And then after they talkèd about it for some time Mr. Young and I talked about the matter, and I asked him if he had the deed with him, and I have forgotten whether he had the deed or a certified copy. He showed it to me, and I said, 'Mr. Young, this says more or less,' and he said 'Yes,' and I said, 'Just now you said you bought the place as a whole and the stock in,' and he said, 'Yes; that is the way I bought it.'

"Q. Did you ask him if he bought it by thé acre?

"A. I asked him, 'The deed says so many acres more or less,' I said to him, 'How did you buy it?' He said, 'I bought it as a whole, and the stock and some farming implements and possibly some hay and stuff.' I don't remember about that, but that was his statement."

Mr. Young on his cross-examination is asked about this conversation, and positively denies it.

The defendant Weakley also took the deposition of E. F. Lytle, his son-in-law. Mr. Lytle testifies that Mr. Sam Weakley said the farm had been sold, and it was not sold by the acre, but that they sold it for $32,000, and put in all the stock. Of course, this is hearsay.

The witness further testified that when he signed the deed conveying the land to Mr. Young there was no understanding that the land was sold by the acre. The understanding was the land was sold as a whole, including certain stock.

This testimony is evidently of no great value.

When it is considered, however, that the laboring oar was on Mr. Young to make out his defense of a sale by the acre, and when it is further considered that this defense must be clearly proven, it seems evident that the appellant, Young has failed to bring himself within the rule.

This conclusion is strengthened by the fact that Mr. Young executed a note which described the farm as containing seven hundred and fifty acres, more or less, and then more than two years afterwards, when a survey had shown the deficiency, accepted a deed containing the same description of the property, which instrument he swears that he himself furnished to Mr. Weakley for execution.

Another fact which appears in the record is not explained by Mr. Young, to wit, his failure to introduce Mr. Yates who signed the notes on which suit is brought in this case, and whose name appears interlined as a vendee in the original title bond exhibited with the record.

Mr. Weakley says that Mr. Yates was not there, but, as already stated, we consider his statements of little value on account of his manifest infirmities.

Mr. Lytle, however, speaks of him as being present when Mr. Sam Weakley returned from showing the farm to Mr. Young on the day of sale:

"I was in the store with Mr. Weakley, and all of them were in there. Mr. Yates and Mr. Weakley came back and said, 'We have sold the farm.' We asked him how much he got an acre, and he said they didn't sell it by the acre, but that they sold it for $32,000 and put in all the stock.

"Q. Which Mr. Weakley was that?

"A. Mr. Sam Weakley."

From this evidence it appears that the terms of the trade were stated in Mr. Yates' presence as being a sale in gross.

In the cross-bill of Young it is alleged that Yates was an active participant in the trade, the language in this behalf being as follows:

". . . That on October 15, 1907, cross-defendant Hickman Weakley contracted to sell to him and J. C. Yates for the sum of $42.66 per acre a farm situated in the Sixth civil district; . . . that on said date, after considerable discussion as to the price that cross-defendant Hickman Weakley wanted for said body of land, he insisted on something like $48 per acre for same. Cross-complainant, Young, and J. C. Yates proposed to cross-defendant Weakley to buy said place at the sum of $42.66 per acre, just as it stood. . . . This proposition was accepted by the said Weakley, and he thereupon executed and delivered to said Young and Yates a bond for title. . . ."

It appears from the record that Mr. Young had purchased Mr. Yates' interest at the time that the deed was executed, but this does not seem to be a sufficient explanation as to why the cross-complainant, Young, failed to take the deposition of his covendee.

Under all the circumstances, and upon the whole record, we are of opinion that the appellant, Young, has failed to make out a case of sale by the acre.

2. The next general insistence of Young is that he had the right to rely upon Mr. Weakley's representations as to the number of acres which it was proposed to convey, and that, where such representations are untrue, are material, and are relied on by the purchaser, he can recover for deficiency in quantity, even though the sale be in gross.

And he further insists that it makes no difference whether the untrue representation was made honestly or fraudulently.

There is no allegation of mutual mistake in the cross-bill; on the contrary, that pleading proceeds upon the theory that Weakley knew he did not have seven hundred and fifty acres at the time of the sale; in other words, that his representation was willful.

The cross-bill contains the following allegation:

"Cross-complainant further states, charges, and alleges that cross-defendant Hickman Weakley knew at the time he contracted to sell and at the time he executed the deed to said farm to cross-complainant that said farm did not contain seven hundred and fifty acres, as he acquired interest in and title to said farm in the following manner and from the following sources:

. . . Leaving within boundaries of and from Weakley to Young $665^{45}/_{160}$ to $667^{45}/_{160}$ acres.

"All of these facts were known to cross-defendant Weakley and unknown to cross-complainant, Young, at the time the contract of purchase was made.

"Notwithstanding this actual knowledge on the part of cross-defendant Weakley, he represented repeatedly to said Young that said farm contained seven hundred and fifty acres, and said Young believed he was getting this quantity of land when he proposed to buy and when said deed was executed to him, as the consideration was based on seven hundred and fifty acres at $42.66 per acre, amounting to $32,000, as recited in said bond for title."

It is evident that this pleading proceeds upon the theory of actual and willful fraud.

In the answer to said cross-bill (also filed under oath) Weakley denies specifically that he made said sale with actual knowledge of a deficiency, denies that he ever represented that the farm contained a particular number of acres, and denies any misrepresentation of any kind. The answer, however, contains the following allegation:

"Defendant Weakley denies that he knew that the farm did not contain seven hundred and fifty acres at the time the deed was executed to Young. While he believed it contained that number of acres, he did not assure or guarantee any such number of acres to said purchaser Young or said Yates, because he did not see said Yates."

In another part of the answer it is said:

"Respondent never represented that there were seven hundred and fifty acres in the farm, but only stated that there was something like that amount in the farm, and

he sold it with that distinct understanding and without any guaranty as to the exact acreage.''

It is further noted that the cross-bill does not proceed upon the theory of rescission. The prayer of said cross-bill is in part as follows:

''That on a final hearing of this cause cross-complainant be given an abatement of $2,815.56 together with interest from the maturity of said note on the purchase price of said land for the said shortage of sixty-six acres at the price of $42.66 per acre, and that said vendor's lien note of $12,000 be ordered surrendered into court, cancelled, and annulled, and that he be given a judgment against cross-defendants, Hickman Weakley, Susie H. Lytle, and E. F. Lytle, for the difference between said $2,815.56 and interest and the balance due on said purchase-money note.''

In the case of *Bigham* v. *Madison,* 103 Tenn., 358, 52 S. W., 1074, 47 L. R. A., 267, the bill was filed for a rescission of a contract of sale, title to about one-half of the lot having failed.

In that case it appeared that the lines were pointed out, but the parties were honestly and mutually mistaken as to their location, and that the purchaser did not get the land which he intended to buy, and which the vendor thought he was selling and had a right to sell. It further appeared that the half as to which title failed was the most valuable part of the land.

The court says:

''The complainant in this case sues upon the facts, and asks a rescission on these facts, and, while he insists that the act of defendants was fraudulent, the

proof fails to make out a case of actual fraud, but instead makes out a case of mutual mistake, equivalent to fraud in law.

"The difference between the two in a case like the present is simply the difference between a party who knowingly misstates facts and one who innocently misstates them, believing them to be true. In either case the aggrieved party is entitled to rescind upon the facts as made out."

Although, as has been pointed out, the cross-bill in this case does not seek rescission, it may perhaps be argued that the purchaser, while claiming actual fraud, would be entitled to relief on the theory. of mutual mistake. The court does not definitely refer to the pleadings in the extract above quoted, but it may fairly be inferred that such reference was intended.

Assuming, however, that the pleadings are sufficient to cover the present claim, and that there is no impropriety in permitting a litigant who has, in a sworn pleading, charged deliberate fraud, from taking the ground that the transaction was' really an innocent mistake, occurring in good faith, the question arises whether the facts of the present case bring it within *Bigham* v. *Madison,.supra,* and that line of authorities.

In those cases there exists a mutual mistake as to the land which was the subject-matter of the contract, the seller and purchaser both believing that the subject-matter of the contract was one thing, whereas it turned out to be another.

But in the present case it is not denied that Mr. Young rode over the farm, nor is it claimed that there was any

mutual mistake about the land which he then saw being the actual farm in question, nor is there any suggestion that the title to any portion of this land failed.

It may well be that Mr. Young could not tell whether this tract contained seven hundred acres or seven hundred and fifty acres by his mere physical examination, as pointed out in the case of *Caughron* v. *Stinespring*, 132 Tenn., 636, 179 S. W., 152, L. R. A., 1916C, 403.

But the point is there was no mutual mistake as to the boundaries of this land, nor did Mr. Young ride over and examine land which he subsequently did not receive.

Under these circumstances the case seems to be governed by *Shields* v. *Thompson*, 4 Baxt., 227, wherein the court, speaking through Judge McFARLAND, says:

"The principle, as applicable to sales of land, may be illustrated in this way: If the purchaser thought he had purchased a particular piece of land, as a part of a farm, and material to its value, and the vendor thought he had sold it, when, in fact, the piece in question did not belong to the farm, or pass by the sale, this would be a clear case of a mutual mistake as to the land sold, and would be good for relief. See 1 Story's Eq. Jur., section 144.

"But, where the land sold is correctly described by metes and bounds, or its boundaries known, and a personal examination had, then a mere mistake as to the quantity of land embraced within the boundary will be no ground for relief in the absence of fraud or misrepresentation, unless, perhaps, the mistake is so great as to raise a presumption of fraud, or shock the conscience

of the court. As, for instance, if the land be on an island in the river, the boundaries of which are clearly in view of the parties, and the lines correctly described, the vendor may represent, and both parties believe, that it contains one hundred acres. It would be no ground for relief to either party, if it should turn out to contain a few acres more or less, although the difference be material to the price. The reason is that the parties were not mistaken in regard to the land sold and bought, the particular price contracted about, and amount of it passed by the acre, the purchaser gets, or thought he was getting; but the parties were simply mistaken as to the number of acres which were embraced within the area, a matter to be ascertained by measurement and calculation—a fact about which one party was as well informed as the other, and about which either might have satisfied himself."

3. This brings us to the third contention of the appellants, to wit, that the discrepancy of sixty-six acres in a supposed tract of seven hundred and fifty acres is so great as to shock the conscience, and thus entitle the purchaser to relief under the exception laid down in *Shields* v. *Thompson, supra.*

The same principle is recognized in *Rich* v. *Scales,* 116 Tenn., 57, 91 S. W., 50, in which the court says:

"Where the sale is in gross, the rule is that no compensation will be granted for either an excess or a deficiency, but this is subject to the following exceptions: If the deed recite the number of acres, and it subsequently turn out upon survey, or be otherwise accurately ascertained, that there is an excess or de-

ficiency, over or under the acreage stated, so great as to justify an inference of fraud, or of a mistake equivalent in its effect to fraud, relief will be granted. If, however, the vendee has inspected the land, and has obtained the very tract he intended to buy and all the vendor intended to sell, he can have no relief, although the deed purported to state the number of acres, unless the difference between the number stated and the actual number of acres contained be so great as to shock the conscience of the court. Relief will then be granted on the ground of fraud."

The determinative question in the case, then, is whether the deficiency of sixty-six acres is sufficient to call for the application of the above rule.

While each case of this nature necessarily turns upon its own facts, yet an examination of our own cases may be of assistance in deciding the question.

The case of *Adams* v. *Brown,* 4 Baxt., 124, is similar to the case at bar in that defense was made against the purchase note by the vendee, who sought to have an abatement because of a deficiency in acreage. The tract supposed to be sold contained two hundred acres, whereas, in fact, it only contained one hundred and fifty acres, the deficiency being fifty acres.

The court says (page 133):

"The next objection, that there is a deficit in the quantity of land, is clearly untenable. The land is not sold by the acre, the boundaries were shown to defendant, and it was estimated in the deed to Brown, as in the deed to Adams, to contain 'two hundred acres more or less.'"

144 Tenn.—25

It will be observed that the deficiency there was one-fourth, and this, apparently, was not deemed sufficient to give, the purchaser any relief, although no specific adjudication is made on the point.

In the case of *Allison* v. *Allison*, 1 Yerg., 16, there was a deficiency of twenty-five acres in a tract supposed to contain three hundred. It was held that warranty of title did not bind the warrantor to make good this deficiency in the number of acres called.for, the conveyance describing the land by metes and bounds.

In the case of *Hendrick's Heirs* v. *Mosely*, 3 Yerg., 74, the tract was sold and stated in the deed as containing eight hundred and four acres. On actual survey it was found to contain eight hundred and sixty-six acres. The bill was filed to obtain compensation for this excess, the complainant alleging a sale by the acre. The court decreed against this contention, leaving open the question whether equity would interpose in the case and give damages for this excess, a deed having been executed and no fraud or mistake proved.

The court says: "The surplus does not amount to eight per cent., there being found in the tract called to contain eight hundred and four acres about sixty acres surplus; this is not unreasonable. In granting lands, ten per cent. was originally allowable in making surveys by the State; and more surveys were made containing a greater surplus than were found to contain less."

Again, speaking of the fact that the deed had been executed the court says: "After this solemn act of making the deed, the parties cannot be let in on slight grounds, to open the contract."

In the case of *Neal v. Allison,* 1 Shan. Cas., 146, the sale was by the acre. There was a deficiency of sixty-eight acres in a tract of one thousand and thirty-five acres. Relief was given to the complainant expressly on the ground that sale was by the acre.

"We think there can be no doubt that the complainant is entitled to an abatement of the price to the extent of the value of this deficiency. There is no fraud, but mutual mistake, and the sale was by the acre, and not by the tract."

This was a sale made at public auction, and the proof showed that the sale was made by the acre.

In the case of *Horn v. Denton,* 2 Sneed, 125, there was a clerk and master's sale of a tract advertised to contain one hundred and seventy-two acres, but found on actual survey to contain one hundred and ninety-two.

Relief was granted in that case because some of the beneficiaries of the sale were minors, and it was held that there was really no mistake in the case, but rather a neglect of duty on the part of the clerk and master.

The court, however, seems to recognize that, if this had been a transaction between individuals, no relief would be afforded, saying:

"In such a case, indeed, mistake is not predicable on the contract for the parties agree to risk their judgments as to price and quantity of land. A very gross mistake might evince such want of judgment as to let in a court of chancery on another ground."

In the case of *Miller v. Bentley,* 5 Sneed, 671, the parties, in writing, contracted to sell four thousand four hundred and forty-seven acres of land at twenty cents per acre.

There being a deficiency of one thousand five hundred acres, relief was allowed the purchaser. The court says: "It is correctly argued that, when a sale is in gross, and not by the acre, and there is no fraud, the purchaser takes at his own risk, as to the quantity, unless the deficiency be very great, so much so as to create a presumption of fraud. But here the sale was not in gross, but by the acre."

In the case of *Barnes* v. *Gregory*, 1 Head, 230, the deed described the land sold as containing thirty acres, more or less. The bill was filed to recover for an excess of fifteen acres, the tract on survey being found to contain forty-five acres.

The court says: "The proof leaves no doubt upon the mind as to the contract having been a sale by the acre, and not in gross."

The court indicates that the purchaser knew of the excess and attempted to practice a fraud upon the owner of the land, setting out the testimony in his behalf. Relief was accordingly given to the vendor.

In the case of *Bradley* v. *Dibbrell*, 3 Heisk., 522, the tract sold was supposed to contain thirty acres, but more than half of this amount, to wit, nineteen and three-fourths acres, was held under better title.

The purchaser filed a bill seeking compensation for the deficiency, and a demurrer thereto was overruled.

In the case of *Blakemore* v. *Kimmons*, 8 Baxt., 470, an administrator sold a tract at public auction as containing sixty-nine acres, more or less. There was a shortage of three or four acres. The court says: "Again, the defendant insists that some three or four acres of

the Milly Whitsell dower tract which he thought he was buying is claimed and in the possession of one Greer. This defense is not available:

"First, because the land was sold in gross, and not by the acre. . . . "

Second, because the defendant had knowledge that this land was in the adverse possession of another, etc.

In the case of *Witherspoon* v. *Porter,* 1 Shan. Cas., 666, the court held that a decided preponderance of the proof showed that the sale was by the acre. The tract was supposed to contain two hundred and fourteen acres, but there was a deficiency of about one hundred and five acres. Complainant was held entitled to an abatement.

In the case of *Myers* v. *Lindsay,* 5 Lea, 331, the sale was made by the acre, and there was a deficiency of forty-seven acres in a tract supposed to contain two hundred and forty-five acres. The purchaser was held entitled to an abatement.

In the case of *Hillis* v. *Martin,* 2 Shan. Cas., 273, a tract was sold in gross at public auction by the clerk and master which was advertised and sold as containing two hundred and sixty-seven acres.

Subsequent survey made two years afterward showed that it contained two hundred and twenty-four acres— a deficiency of forty-three acres.

The purchaser filed a bill for an abatement of the price, but the chancellor dismissed his bill, and this court affirmed the decree.

In the case of *Moses* v. *Wallace,* 7 Lea, 413, a tract of land was described in the title bond as containing forty-three and three-fourths acres, more or less, and there

was a failure of title to three or four acres. The purchaser was allowed to have an abatement of the price, the court saying:

"The rule of equity, well settled in this State, is that, where there is a partial failure of title, the vendee may elect to retain the land so far as the title is good, and have an abatement of the purchase price to the extent of the value of land lost."

In the case of *Deakins* v. *Alley*, 9 Lea, 494, the sale was held to be by the acre, and an abatement was allowed, there being a deficiency of twenty-five acres in a tract of one hundred and thirty-one acres.

In the case of *State, to the Use, etc.,* v. *Keller,* 11 Lea, 399, a sale was made by the acre. The tract was surveyed by the county surveyor as containing one hundred and twenty-five acres, but it actually contained one hundred and fifty-five acres—a surplus of thirty acres. It was held that the county surveyor was liable for this mistake.

In the case of *Waters* v. *Hutton*, 85 Tenn., 109, 1 S. W., 787, there was a sale in gross, the deed estimating the combined acreage of several tracts to be three hundred and seven acres, more or less.

There was a deficiency of sixty-four acres caused by the failure of title as to two tracts of sixty acres and four acres, respectively, which were adversely held at the time of the sale.

The court finds that the complainant knew at the time that he was not buying these two tracts, and denied him relief, saying:

"He has gotten all that he understood he was buying, all that the defendants understood they were selling. The land which he fails to get was not estimated by either buyer or seller in fixing the value. He gets a less number of acres than he expected, but his deed conveys him three hundred and seven acres, more or less, and the loss is not such as to prove fraud. The sale being by the gross, and not by the acre, he is entitled to no relief upon this account."

In the case of *Caughron* v. *Stinespring*, 132 Tenn., 636, 179 S. W., 152, L. R. A. 1916C, 403, the sale was held to be by the acre, and there was a deficiency of fifty-seven and seven-tenths acres in a tract sold as containing six hundred. The court says that this deficiency in acreage "was sufficient in amount to be material in the contract."

In the case of *Bigham* v. *Madison*, 103 Tenn., 358, 52 S. W., 1074, 47 L. R. A., 267, the sale was in gross, but there was a failure of title as to about one-half of the land, the most valuable part of it, and upon which the vendee erected his house. Relief was granted on the ground of mutual mistake; the parties being mutually in error as to the location of the line.

The court lays down the rule that the words "more or less" cover only a reasonable excess, or deficiency, saying: "It has been held that such discrepancy in quantity, in order to be covered by such terms, should not exceed ten to fifteen per cent., even when sales are confessedly in gross, and twenty per cent. is too great a difference to be so covered. 15 Am. & Eng. Enc. of Law, 718. And thirty-three and one-third per

cent. is such an amount as universally had obtained relief."

In the American & English Encyclopedia of Law (2d Ed.), vol. 29, p. 631, it is said: "From the very nature of things there is no fixed rule for determining what deficiency entitles the purchaser to abatement of the purchase price on the ground of fraud or mistake, but the right is dependent on the facts of each particular case. The notes contain cases giving specific instances of deficiency for which the purchasers were held entitled to compensation."

A large number of cases from Alabama, Arkansas, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Minnesota, Missouri, New Jersey, New York, Ohio, North Carolina, Texas, Vermont, Virginia, Washington, and West Virginia are cited in the note; the deficiency and the acreage as sold being in each case given.

Without undertaking to cite these cases or to examine them, the figures given as to acreage sales are as follows:

Deficiency of one hundred and sixty-eight acres out of one thousand two hundred and sixty-eight sold. Deficiency of twenty acres out of one hundred and eighty-two sold. Deficiency of eighty-four acres out of one hundred and eighty sold. Deficiency of forty-one acres out of two hundred and nineteen sold. Deficiency of thirty-five acres out of one hundred and forty sold. Deficiency of sixty-seven acres out of six hundred and ten sold. Deficiency of thirty-two acres out of two hundred sold. Deficiency of twelve and one-half acres out of fifty sold. Deficiency of twenty-four acres out of one hundred and twenty-nine sold. Deficiency of forty

acres out of one hundred and seventy sold. Deficiency of seventeen acres out of forty sold.

Deficiency of thirteen acres out of thirty-three and one-half sold. Deficiency of twenty-six acres out of one hundred and eighty-three sold. Deficiency of sixteen acres out of one hundred and twenty-nine sold. Deficiency of one hundred and thirty acres out of six hundred and sixty-four sold. Deficiency of one hundred and seventy-eight acres out of seven hundred and sixteen sold. Deficiency of thirty acres out of one hundred and eighty-seven sold. Deficiency of twelve acres out of one hundred and nine sold. Deficiency of nineteen acres out of eighty sold. Deficiency of twenty acres out of one hundred and thirty-five sold. Deficiency of fourteen acres out of two hundred and twenty sold. Deficiency of four hundred acres out of one thousand sold. Deficiency of thirty-four acres out of one hundred sold. Deficiency of five hundred acres out of one thousand sold. Deficiency of twenty-one acres out of one hundred and forty-six and one-half sold. Deficiency of twenty-one acres out of eighty sold. Deficiency of one hundred and twelve acres out of two hundred sold. Deficiency of one hundred and ninety-six acres out of eight hundred sold. Deficiency of sixty-six acres out of two hundred and sixty-five sold. Deficiency of forty-six acres out of one hundred and twenty-seven sold. Deficiency of two hundred and ten acres out of eight hundred and ninety-two sold. Deficiency of fourteen acres out of one hundred and forty sold. Deficiency of ten acres out of thirty-six and one-half sold. Deficiency of twenty-five acres out

of one hundred and one sold. Deficiency of forty-three acres out of six hundred and ninety sold.

It will be observed that in only two instances does the deficiency amount to less than ten per cent.

As heretofore shown, it has been explicitly held that a surplus of sixty acres in eight hundred and four acres, a variance of less than eight per cent., is not unreasonable. *Hendrick's Heirs* v. *Mosely,* 3 Yerg., 74.

Again, in *Waters* v. *Hutton,* 85 Tenn., 109, 1 S. W., 787, *supra,* the court, speaking through Judge LURTON, has expressly held that a deficiency of sixty-four acres in a sale of three hundred and seven acres, more or less, was not such as to prove fraud.

In view of these authorities, the deficiency in the present case of sixty-six acres out of a tract supposed to contain seven hundred and fifty does not bring appellant within the rule for which he contends.

As already shown, the appellant only valued the live stock at $6,000, whereas, according to his testimony, he realized $8,000 or $9,000 out of this stock.

The case, therefore, is not one of hardship, as contended in the able brief of appellant's counsel.

We think the chancellor's decree was correct, and it will be affirmed.